AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
Sep 22, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

United States of America
v.

BOBBY LEE STANFIELD, MARCUS GIPSON, RONEEL PRASAD

*Defendants*

Case No. 2:26-mj-0138 CSK

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 2026 to the present in the county of Solano in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| **21 U.S.C. §§ 846 & 841(a)(1)** | **Conspiracy to distribute controlled substances** |
| **21 U.S.C. § 841(a)(1)** | **Distribution of Fentanyl** |
| **21 U.S.C. § 841(a)(1)** | **Possession of Methamphetamine with Intent to Distribute** |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

/s/

*Complainant's signature*

Dalton Ryken, FBI Task Force Officer

*Printed name and title*

Sworn to me and signed via telephone.

Date: September 22, 2026

*Judge's signature*

City and state: Sacramento, California

Chi Soo Kim, U.S. Magistrate Judge

*Printed name and title*

ERIC GRANT
United States Attorney
CHARLES CAMPBELL
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br>v.<br><br>BOBBY LEE STANFIELD, MARCUS GIPSON, RONEEL PRASAD<br><br>Defendants. | CASE NO.<br><br>AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT<br><br>**UNDER SEAL** |

I, Dalton Ryken, being first duly sworn, hereby depose and state as follows:

1. I make this affidavit in support of an application for a Criminal Complaint and Arrest Warrants charging Bobby Lee STANFIELD, Marcus GIPSON, and Roneel PRASAD with knowing and intentionally conspiring to distribute controlled substances, in violation of 21 U.S.C. § 846 & 841(a)(1), beginning on a date unknown but no later than on or about April 1, 2026, and continuing to present; charging Bobby Lee STANFIELD and Roneel PRASAD with distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1), on or about April 27, 2026; and charging Marcus GIPSON with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), on or about September 8, 2026.

## II. AGENT BACKGROUND

2. I am currently employed by the Solano County Sheriff's Office and have been since

September of 2014. I am currently assigned as a Detective and TFO (Task Force Officer) with the Federal Bureau of Investigation's (FBI) Solano County Violent Crime Task Force (SCVCTF) and am dually sworn as a state and federal law enforcement officer.

3. My responsibilities include investigations pertaining to violent offenders and/or violent organizations. These investigations frequently involve the possession and possession for sale of controlled substances and firearms, robberies, homicides, etc. I am currently assigned to a task force which includes members from various local agencies as well as federal agents. Part of my assignment is to assist local Solano County law enforcement partners with investigations involving violent acts and violent crime.

4. I attended a six-month basic police officer academy at the Napa Valley Police Academy in Napa, California. This training included over 20 hours of specialized training in controlled substances, which also included, but was not limited to, controlled substance identification, packaging, distribution, influence, and characteristics of use. I have attended over 200 hours of formal training pertaining to controlled substances and controlled substance investigations. I have arrested or assisted with the arrest of persons for possession of cocaine, cocaine base, crystal methamphetamine, marijuana, heroin, fentanyl, and MDMA. I have contacted no less than 500 people who have been arrested for possession of controlled substance(s), possession of controlled substances for sale, and/or firearms possession.

5. I have participated in discussion and informal training sessions with more experienced controlled substance agents regarding the methods used by controlled substance manufactures, traffickers, and users. I regularly read controlled substance related literature to remain abreast of contemporary topics. I have spoken with individuals who have admitted possessing controlled substances for sale and/or possessing controlled substances for personal use. These individuals have discussed various topics surrounding controlled substances to include: packaging, pricing, use, manufacturing, methods of concealing, money laundering, transportation, protection, and the overall lifestyle and culture surrounding the illicit business.

6. I have testified as an expert in Solano County Superior Court for possession of methamphetamine, heroin, cocaine, marijuana and fentanyl for sale. As a Detective and TFO, I have

investigated cases involving possession of controlled substances and firearms for sale. Through these investigations, I have participated in numerous controlled buys of firearms and controlled substances.

7. I have participated in several investigations involving criminal gang activity within the county of Solano. I regularly meet with various Deputies and Detectives from the Solano County Sheriff's Office, other members of the FBI task force, and counterparts from other law enforcement agencies to share information regarding gang activity. I also regularly speak with gang members and their associates. I have attended various formal and informal training pertaining to gang activity and regularly review intelligence reports from federal, state, and local agencies regarding gang trends and activities.

8. I was previously assigned to the Sheriff's Enforcement Team (SET). SET's responsibility and mission is the apprehension of fugitives and checking on the compliance of individuals on supervised release. During my time on SET, I conducted numerous controlled substance and firearms investigations. I authored and served various search warrants pertaining to controlled substances, firearms, and stolen property. I have worked with various bureaus within the Sheriff's Office, as well as various federal and state law enforcement agencies involving investigations of various crimes.

9. Previously, while employed as a Deputy Sheriff, I was assigned to the Solano County Sheriff's Office Patrol Bureau for a total of four years. During this time, I made hundreds of arrests, conducted and participated in over a thousand criminal investigations relating to, but not limited to, homicides, assaults, domestic violence, robberies, burglaries, thefts, sexual assaults, stolen vehicles, possession of controlled substances for sale, firearms possession, gang participation, and missing persons. These investigations consisted of interviewing witnesses, victims, and possible leads; locating and gathering evidence; apprehending criminal suspects and violators of the law; preparing and processing all necessary reports; and testifying as a witness in court.

10. Prior to becoming a Deputy Sheriff, I graduated from California State University Sacramento in 2012 with a Bachelor of Science Degree in Criminal Justice. During my studies, I attended and completed courses relating to criminal investigations of the following: crimes against persons; crimes against property; narcotics; gangs; and firearms related offenses.

11. The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

12. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy to distribute and possess with intent to distribute controlled substances); have been committed by BOBBY LEE STANFIELD (STANFIELD), RONEEL PRASAD (PRASAD), MARCUS GIPSON (GIPSON), and MONTRELL AUSTIN (AUSTIN). Collectively the violations described above will be referred to as the "TARGET OFFENSES".

## I. <u>PROBABLE CAUSE</u>

13. The United States Government, specifically the FBI's Solano County Violent Crime Task Force (SCVCTF), is investigating STANFIELD, PRASAD, GIPSON, and AUSTIN for firearms and controlled substance trafficking in the Eastern District of California. During the course of this investigation, SCVCTF agents have conducted multiple controlled purchases of fentanyl and methamphetamine from STANFIELD and PRASAD. Agents have observed PRASAD communicating and meeting with STANFIELD in a manner consistent with PRASAD acting as STANFIELD's source of supply for fentanyl. Agents have observed GIPSON communicating and meeting with STANFIELD in a manner consistent with GIPSON acting as STANFIELD's source of supply for methamphetamine.

14. During the investigation, agents have also observed communication and meetings between GIPSON and AUSTIN which are consistent with GIPSON supplying methamphetamine to AUSTIN as well.

15. Based on knowledge obtained through prior investigations into gang and criminal activity in Vallejo and checks of law enforcement databases, agents believe that GIPSON, and AUSTIN are each affiliated with the Cutthroat Mob criminal gang, which operates in a neighborhood in north Vallejo known as the Country Club Crest.

16. The SCVCTF is currently working with two Confidential Human Sources in the course

of this investigation. For simplicity, these individuals will be referred to as CHS-1[1] and CHS-2.[2]

17. In March 2026, CHS-1 reported that they had been in contact with STANFIELD. CHS-1 reported that STANFIELD had agreed to supply CHS-1 with controlled substances. CHS-1 advised they had recently spoken with STANFIELD's on the phone and STANFIELD's phone number was 707-655-3363 (STANFIELD PHONE 1). SCVCTF was familiar with STANFIELD from previous investigation(s) and knew STANFIELD was involved with controlled substance trafficking and firearm possession in Solano County. A review of STANFIELD's criminal history revealed he had numerous felony convictions. Several of the convictions are as follows: 459 PC-Burglary, 245(a)(1) PC-Assault with a Firearm, 236 PC-False Imprisonment-Armed with a Firearm, 11351.5 HS-Possession of Cocaine Base for Sale (4 Convictions), and 2800.2 VC-Evading. Further, STANFIELD had recently been released from prison and was on a grant of PRCS (Post Release Community Supervision) for his evading conviction.

18. In April 2026, CHS-1 was tasked with setting up and arranging a controlled purchase of methamphetamine and fentanyl from STANFIELD.

//

---

[1] The CHS started cooperating with the FBI in exchange for consideration for potential federal charges regarding illegal firearms and controlled substance trafficking. The CHS is working on fulfilling his/her commitment to law enforcement. The CHS has also received some monetary compensation.

The CHS has been convicted of misdemeanor driving under the influence, misdemeanor being under the influence of a controlled substance, misdemeanor burglary, misdemeanor being in possession of a controlled substance and misdemeanor possession of a firearm in public.

The CHS has been an informant for the FBI since February 2025 and has been proven to be a reliable CHS thus far. The CHS' reporting has been proven to be truthful and has been independently verified by FBI agents and Task Force Officers.

[2]The CHS started cooperating with the FBI for monetary compensation in January of 2025. The CHS had previously cooperated with a local law enforcement agency in exchange for consideration in a criminal case. The CHS successfully worked with the local law enforcement agency over two years.

The CHS has a long criminal history including 20 felony convictions that would be considered crimes of moral turpitude. None of these convictions were related to child abuse, sexual acts with children, rape, murder, or perjury.

CHS has participated in numerous operations under the direction of law enforcement including but not limited to purchasing narcotics, purchasing firearms, providing location information for wanted individuals and providing information related to a homicide investigation. All of the information provided by CHS has been checked, verified and of the information provided, none of it has been found to be false.

**B. First Controlled Buy Operation with STANFIELD on April 13, 2026, using CHS-1**

19. On April 13, 2026, CHS-1 communicated with STANFIELD via STANFIELD PHONE 1. During the phone call, STANFIELD agreed to supply CHS-1 with two ounces of methamphetamine for $125 an ounce ($250 total). CHS-1 told STANFIELD to give CHS-1 $600 worth of fentanyl on top of the $250 which was intended for the methamphetamine ($850 total).

20. On April 13, 2026, SCVCTF conducted a controlled buy/walk operation for the agreed-upon methamphetamine and fentanyl from STANFIELD. Prior to the buy, CHS-1 and their vehicle were searched for contraband with negative results. CHS-1 was provided $850 of FBI buy funds. In summary, CHS-1 was instructed by STANFIELD to meet at the Econo Lodge Hotel located at 458 Fairgrounds Dr. in Vallejo. Surveillance units followed and monitored CHS-1 to and from the buy location. CHS-1 arrived at 458 Fairgrounds Dr. and was instructed by STANFIELD to drive to the back lot of the hotel. STANFIELD was standing in the doorway of a hotel room and instructed CHS-1 to come inside. CHS-1 entered the hotel room and sat in a chair by the door. An unidentified Black female adult (W1) was in the room when CHS-1 entered. STANFIELD was on the phone and CHS-1 spoke with W1. On a table in the room was the agreed-upon methamphetamine and fentanyl which was pre-weighed and packaged. W1 asked CHS-1 which controlled substances were intended for CHS-1. CHS-1 advised all were intended for CHS-1. CHS-1 handed W1 the $850 cash buy funds and W1 handed the methamphetamine and fentanyl to CHS-1. STANFIELD walked to CHS-1 and gave them a "fist bump" prior to CHS-1 departing.

21. CHS-1 returned to meet with handlers under constant surveillance and 58.7 grams of suspected methamphetamine, and 9 grams of suspected fentanyl were recovered. CHS-1 and their vehicle were again searched for contraband and/or money with negative results.




*Figure 1: Photos of controlled substances recovered from controlled buy/walk*

22. The United States Department of Justice Western Laboratory later analyzed the suspected methamphetamine and suspected fentanyl sold by STANFIELD. On July 13, 2026, the Western Laboratory confirmed the substance was methamphetamine with a purity of approximately 100% and with a net weight of approximately 55.6 grams. On July 23, 2026, the Western Laboratory confirmed the substance was fentanyl with a purity of approximately 37% and with a net weight of approximately 7.31 grams.

23. On April 15, 2026, CHS-2 reported that STANFIELD was actively involved in selling methamphetamine and fentanyl in Vallejo, CA. CHS-2 identified STANFIELD by a photo taken from STANFIELD's Instagram account. CHS-2 advised that STANFIELD PHONE 1 belonged to STANFIELD. Following the report, CHS-2 was tasked with setting up and arranging a controlled purchase of methamphetamine and fentanyl from STANFIELD.

24. TFO Ryken reviewed STANFIELD's probation address had been updated to 1137 Louisiana St. Vallejo. TFO Ryken spoke with STANFIELD's Probation Officer who advised STANFIELD was living in a residence directly behind 1137 Louisiana St. accessible through Overland Alley. STANFIELD's Probation Officer confirmed the address was 1137 Overland Alley, Vallejo (**STANFIELD's Residence)** and STANFIELD was residing in the bottom story apartment.

### C. <u>Controlled Buy Operation with STANFIELD on April 27, 2026 using CHS-2.</u>

25. On April 26, 2026, CHS-2 communicated with STANFIELD by calling STANFIELD PHONE 1 and arranged the controlled purchase. During the phone call, STANFIELD agreed to supply

CHS-2 with two ounces of methamphetamine for $125 an ounce ($250 total) and two ounces of fentanyl for $1,000 an ounce ($2,000 total).

26. On April 27, 2026, SCVCTF conducted a controlled buy/walk operation for the agreed-upon methamphetamine and fentanyl from STANFIELD. Prior to the buy, CHS-2 and their vehicle were searched for contraband with negative results. CHS-2 was provided $2,250 of FBI buy funds. In summary, CHS-2 was instructed by STANFIELD to meet at STANFIELD's Residence. Prior to the controlled buy, surveillance units observed STANFIELD arrive at STANFIELD's Residence driving his gold 2003 Mercedes CLK bearing California License plate 6RGM550 (STANFIELD's Vehicle 1).

27. Surveillance units followed and monitored CHS-2 to and from the buy location. CHS-2 arrived at STANFIELD's Residence and was instructed by STANFIELD to come inside the residence. Once inside, STANFIELD made a phone call and asked the individual on the phone if they were on their way, because somebody was there to pick up. A review of call detail records for STANFIELD revealed the number that he called was 707-656-7520 (PRASAD PHONE 1). An open-source record check of the number showed that it is associated to Roneel PRASAD. On May 5, 2026, the FBI received an administrative subpoena return from T-Mobile which revealed that PRASAD PHONE 1 was subscribed to PRASAD.

28. While inside STANFIELD's Residence, CHS-2 observed approximately a pound of methamphetamine, including the two ounces requested by CHS-2 which were already weighed out and in a plastic bag. CHS-2 provided STANFIELD with the funds and waited for the fentanyl to be delivered.

29. Shortly after, surveillance units observed a silver 2017 Nissan Altima CA# 9FLT206 (PRASAD's Vehicle) arrive at the buy location. Surveillance units observed an Indian male adult exit PRASAD's Vehicle and retrieve a black bag from the vehicle before walking toward the residence. A DMV check of the PRASAD's Vehicle revealed the vehicle was registered to PRASAD. Agents located a CalPhoto of PRASAD and identified him as the driver of PRASAD's Vehicle. PRASAD's Vehicle is registered to PRASAD at 345 Honeysuckle Dr., Fairfield, California.

30. During a later debrief, CHS-2 reported that PRASAD arrived at the residence and entered with a black bag. PRASAD opened the bag and CHS-2 observed approximately six ounces of powder

fentanyl in the front compartment of the black bag. PRASAD provided CHS-2 with the agreed-upon two ounces of fentanyl. CHS-2 knew PRASAD from prior contacts with STANFIELD. STANFIELD referred to PRASAD as his "brother" and CHS-2 believed, based on prior contacts with STANFIELD, that PRASAD worked for STANFIELD dealing controlled substances. A records check of PRASAD's criminal history revealed he had several arrests for domestic violence, assault with a deadly weapon and driving under the influence. PRASAD had one felony conviction for 594 PC-Vandalism.




*Figure 2: Photos of controlled substances recovered from controlled buy/walk*

31. The United States Department of Justice Western Laboratory later analyzed the suspected methamphetamine sold by STANFIELD. On July 20, 2026, the Western Laboratory confirmed the substance was methamphetamine with a purity of approximately 100% and with a net weight of approximately 55 grams.

**D. <u>Phone Call activity between CHS-1 and STANFIELD on May 13, 2026.</u>**

32. On May 13, 2026, CHS-1 was instructed by SA Carla Ceccon and TFO Ryken to place a phone call to STANFIELD and ask if the CHS could purchase a pound of methamphetamine from STANFIELD for $1200 or less. STANFIELD advised the CHS he had to make a quick call to check the price. Agents reviewed call data from STANFIELD's phone and observed the call between STANFIELD and the CHS terminate. STANFIELD immediately called 678-613-1005 (GIPSON PHONE 1). After a short duration, STANFIELD immediately called back CHS-1. CHS-1 contacted agents and reported STANFIELD advised he could sell CHS-1 one pound of methamphetamine for

$1200. An open-source record check of GIPSON PHONE 1 showed that it is associated to Marcus GIPSON. On May 14, 2026, the FBI received an administrative subpoena return from T-Mobile which revealed the GIPSON PHONE 1 was subscribed to Marcus GIPSON.

33. A review of GIPSON's criminal history revealed he had numerous felony convictions for 246 PC-Shooting at an Occupied Dwelling and Possession of Cocaine Base for Sale (3 convictions). Additionally, GIPSON had a 2008 federal conviction for 21 USC 841(a)(1)-Possession with Intent to Distribute at Least 50 grams of Crack Cocaine. SCVCTF conducted checks of GIPSON which revealed that he was listed as a past member or associate of the "Cutthroat Mob" criminal gang, which operates mainly in a northern neighborhood of the city of Vallejo known as the Country Club Crest.

**E. <u>Surveillance of Marcus GIPSON at 5058 Brookdale Cir. Fairfield and 1457 N. Camino Alto. Vallejo</u>**

34. A record check of GIPSON revealed 5058 Brookdale Cir. Fairfield (GIPSON's Residence #1) was the address listed on his driver license. During the week of May 20, 2026, SCVCTF deployed a video surveillance vehicle capturing GIPSON's Residence 1. TFO Ryken later reviewed the video surveillance footage. On May 21, 2026 at 0805 hours, GIPSON exited the front door of GIPSON's Residence 1 and entered a Silver Dodge Avenger that was parked in the driveway. The Dodge Avenger was later confirmed to have California License Plate 9WXE719 (GIPSON's Vehicle) which was registered to GIPSON at GIPSON's Residence 1. At 1956 hours, GIPSON's Vehicle returned and GIPSON entered GIPSON's Residence 1. At 2007 hours, GIPSON exited GIPSON's Residence 1 and left in GIPSON's Vehicle. TFO Ryken further observed GIPSON entering and exiting GIPSON's Residence 1 on several more occasions during the review of the surveillance footage from the week of May 20, 2026.

35. On June 9, 2026, TFO Ryken located GIPSON's Vehicle parked in the parking lot of the apartment complex located at 1457 N. Camino Alto, Vallejo (the Camino Alto Apts.). GIPSON's Vehicle was parked in stall #41 of the carport. Throughout the investigation, GIPSON's vehicle has been observed parked in stall 41 on numerous occasions. Further, GPS ping data of GIPSON's phones consistently plots alternating during nighttime hours at GIPSON's Residence 1 and at the Camino Alto

Apts., consistent with GIPSON sleeping and/or residing at both locations.[3] The pattern of GIPSON's cell phones and GIPSON's Vehicle consistently frequent the Camino Alto Apts. and GIPSON's Residence 1 daily. On August 25, 2026, TFO Ryken observed GIPSON use a key to unlock and enter Apt. 208 at the the Camino Alto Apts (GIPSON Residence 2).

### F. Controlled Buy Operation with STANFIELD on June 10, 2026 using CHS-1

36. On June 10, 2026, SCVCTF conducted a controlled buy from STANFIELD. Prior to the controlled buy, surveillance units located and obtained visual observations of STANFIELD and GIPSON. At 1054 hours, CHS-1 was instructed by TFO Ryken and SA Ceccon to call STANFIELD and order one pound of methamphetamine. CHS-1 contacted STANFIELD on at STANFIELD PHONE 1. STANFIELD advised CHS-1 that the transaction could occur later in the day.

37. At 1135 hours, CHS-1 was instructed by TFO Ryken and SA Ceccon to text STANFIELD and ask if 1:30 pm would work to pick up the pound of methamphetamine. Agents monitored the phone tolls from STANFIELD and GIPSON's cell phones and observed the following:

a) 1136 hours, CHS texted STANFIELD.

b) 1137 hours, STANFIELD texted CHS-1.

c) 1137 hours, STANFIELD made an outgoing call to GIPSON PHONE 1 and the call lasted approximately 26 seconds.

d) 1137 hours, CHS-1 texted STANFIELD.

e) 1138 hours, STANFIELD texted CHS-1.

38. Based on the timing and sequence of the communications, I believe that STANFIELD was texting GIPSON to confirm that GIPSON was able to provide STANFIELD with all or part of the pound of methamphetamine that STANFIELD intended to sell to CHS-1 later that day.

39. At 1148 hours, 11 minutes after STANFIELD called GIPSON, GIPSON's Vehicle was observed by surveillance turning onto Overland Alley and parking in front of STANFIELD's Residence At the same time PRASAD's Vehicle left the residence as GIPSON was arriving. GIPSON exited his

[3] The apartment complex at 1457 N. Camino Alto contains multiple residential units. As detailed below, agents later observed GIPSON use a key to unlock and enter Apt. 208. For simplicity, this warrant uses GIPSON Residence 2 to refer to Apt. 208 specifically.

vehicle and was carrying a black grocery bag which appeared to be weighted and heavy. GIPSON walked towards the door of STANFIELD's Residence. PRTT data at this time revealed that GIPSON called STANFIELD as GIPSON arrived at the residence. Shortly thereafter, GIPSON entered STANFIELD's Residence.

40. At 1154 hours, GIPSON exited STANFIELD's Residence and walked to GIPSON's Vehicle. GIPSON was again carrying the black grocery bag, however the bag appeared to be less full and not as heavily weighed as when GIPSON arrived. After entering GIPSON's Vehicle, GIPSON drove away from STANFIELD's Residence.

41. After GIPSON left STANFIELD's Residence, STANFIELD told CHS-1 to meet at the Wells Fargo Bank located at 1702 Tennessee St. Vallejo to purchase the pound of methamphetamine. TFO Ryken and SA Ceccon met CHS-1 at a pre-arranged meeting location. CHS-1's person and vehicle were searched for contraband and money with negative results. CHS-1 was provided $1,200 of FBI buy funds for the purchase. CHS-1 was monitored under constant surveillance to and from the buy location.

42. At 1357 hours, CHS-1 pulled into the Wells Fargo parking lot located at 1702 Tennessee St. At 1419 hours, STANFIELD left his residence in his STANFIELD's Vehicle 1 and turned N/B on Monterey St. At 1420 hours, STANFIELD's Vehicle 1 turned E/B on Tennessee St. At 1422 hours, STANFIELD's Vehicle 1 pulled into the Wells Fargo lot and passed the front doors to the bank. STANFIELD honked the horn from STANFIELD's Vehicle 1 and yelled to CHS-1, "Come get it."

43. At 1423 hours, CHS-1 entered the passenger seat of STANFIELD's Vehicle 1 and closed the door. STANFIELD and CHS-1 drove through the parking lot back to Tuolumne St.. At 1424 hours, STANFIELD's Vehicle 1 occupied by STANFIELD and CHS-1 pulled back into the backside of the bank parking lot and drove back to CHS-1's vehicle. At 1424 hours, CHS-1 exited the passenger seat of STANFIELD's Vehicle 1 carrying a cardboard box and walked to the CHS vehicle. STANFIELD and STANFIELD's Vehicle 1 exited the parking lot.

44. SA Ceccon and TFO Ryken met CHS-1 at the prearranged meeting location. Agents recovered the pound of methamphetamine purchased from STANFIELD which was inside a cardboard box. No unauthorized contraband or money was located on CHS-1 or in CHS-1's vehicle. CHS-1 advised STANFIELD provided the methamphetamine inside cardboard box to CHS-1 in exchange for

the $1,200.




*Figure 3: Photo of methamphetamine purchased during 06/10/26 controlled buy.*

45. Based on the evidence and circumstances on June 10, 2026, surveillance observations and PRTT data provide probable cause that STANFIELD sourced the pound of methamphetamine from GIPSON.

46. The United States Department of Justice Western Laboratory later analyzed the suspected methamphetamine sold by STANFIELD and supplied by GIPSON. On August 20, 2026, the Western Laboratory confirmed the substance was methamphetamine with a purity of approximately 99% and with a net weight of approximately 442.7 grams.

### G. <u>Controlled Buy Operation with STANFIELD on July 16, 2026 using CHS-2</u>

47. On July 15, 2026, CHS-2 was instructed by TFO Ryken to reach out to STANFIELD and inquire if STANFIELD had any firearms for sale. CHS-2 called STANFIELD and STANFIELD advised he had firearms and told CHS-2 to "bring what you want to spend." STANFIELD did not want to talk about the deal on the phone.

48. On July 16, 2026, SCVCTF conducted a controlled buy from STANFIELD. Prior to the controlled buy, CHS-2 arranged the purchase of an ounce of fentanyl from STANFIELD as well as an unknown make and model of handgun. TFO Ryken and SA Ceccon met CHS-2 at a pre-arranged

meeting location. CHS-2's person and vehicle were searched for contraband and money with negative results. CHS-1 was provided $1,200 of FBI buy funds for the purchase. CHS-2 was monitored under constant surveillance to and from the buy location.

49. At 1728 hours, CHS-2 arrived at STANFIELD's Residence. CHS-2 knocked on the door to the residence and an unknown mixed race female adult (W2) answered the door. CHS-2 entered the residence and sat down at a table with STANFIELD. STANFIELD placed a backpack on the table and removed a bag of fentanyl from the backpack and gave it to CHS-2. STANFIELD removed several other bags of fentanyl and methamphetamine from the backpack in the presence of CHS-2. CHS-2 gave STANFIELD $1000 of FBI buy funds and told STANFIELD they had another $1000 to purchase a pistol. STANFIELD told CHS-2 a female named "Kim" had a piece (pistol) for sale for $800. STANFIELD made a phone call and no one answered. STANFIELD then received a phone call and spoke to a female. STANFIELD advised he spoke with "Kim" and the firearm would be delivered later in the evening if CHS-2 still wanted it. CHS-2 left with the fentanyl and advised STANFIELD they would call when they wanted to get the firearm.

50. While CHS-2 was returning to CHS-2's vehicle, CHS-2 ran into three black male adults who were sitting in a black Audi A6. CHS-2 recognized the males and knew they were associated to the apartment above STANFIELD's. CHS-2 was later shown a photo of Montrell AUSTIN and CHS-2 advised AUSTIN was the male who was seated in the back seat of the Audi, and that AUSTIN lived on the top floor of 1137 Overland Alley (AUSTIN's Residence). CHS-2 spoke to the occupants of the Audi briefly. CHS-2 observed an AR-15 style firearm in the Audi. CHS-2 also saw that the passenger (FNU LNU) had a Glock firearm with a fully automatic switch on his lap. CHS-2 departed the area.

51. SA Ceccon and TFO Ryken met CHS-2 at the prearranged meeting location. Agents recovered the ounce of fentanyl purchased from STANFIELD. No unauthorized contraband or money was located on CHS-2 or in CHS-2's vehicle. The remaining $1000 of FBI buy funds was given back to agents by CHS-2.




*Figure 4: Photo of fentanyl purchased during 07/16/26 controlled buy.*

### H. July 26, 2026 arrest of STANFIELD in West Sacramento

52. On July 26, 2026, a West Sacramento Police Officer observed a grey 2007 Dodge Charger bearing California License plate 8YRC133 (STANFIELD's Vehicle 2) at an AMPM gas station located at 4790 West Capital Ave. West Sacramento. The officer conducted a record check of STANFIELD's Vehicle 2 and learned STANFIELD's Vehicle 2 was registered to STANFIELD, who was on PRCS. The officer contacted STANFIELD and a female passenger and conducted a probation search of STANFIELD and of STANFIELD's Vehicle 2. During the probation search, a loaded ten round Glock magazine was located under the driver seat where STANFIELD had been seated. The magazine was loaded with live .40 caliber ammunition. STANFIELD was arrested and booked into Yolo County jail for being a felon in possession of ammunition. During this investigation, STANFIELD's Vehicle 2 has been observed frequently at STANFIELD's Residence. STANFIELD has been observed frequently driving STANFIELD's Vehicle 2.

### I. Controlled Buy Operation with STANFIELD on July 29, 2026 using CHS-1

53. On July 29, 2026, CHS-1 was instructed by SA Ceccon and TFO Ryken reach out to STANFIELD and inquire if STANFIELD would supply CHS-1 with two pounds of methamphetamine. SCVCTF agents and detectives from assisting agencies established surveillance of STANFIELD and GIPSON prior to the controlled buy. At approximately 1143 hours, CHS-1 called STANFIELD and inquired into the purchase of two pounds of methamphetamine. STANFIELD told CHS-1 he would sell

him two pounds of methamphetamine for $1200 a pound ($2400 total) but the deal would have to occur later in the afternoon after STANFIELD's court appearance in Yolo County.

54. Throughout the operation, surveillance units observed STANFIELD driving STANFIELD's Vehicle 1. At approximately 1241 hours, STANFIELD and an unknown black female adult drove from STANFIELD's Residence to 345 Honeysuckle Dr. Fairfield (PRASAD's Residence). PRASAD's Residence is listed as PRASAD's residence in PRASAD's DMV records, including on PRASAD's California Driver License. When STANFIELD arrived, PRASAD's Vehicle (registered to PRASAD's Residence) was parked in front of the residence. As TFO Ryken drove by PRASAD's Residence he observed STANFIELD knocking on the front door. On a second drive by of PRASAD's Residence a few minutes later, STANFIELD was no longer at the front door, consistent with him entering the residence. Shortly after, STANFIELD, PRASAD and the unknown female left PRASAD's Residence in STANFIELD's Vehicle 1 and drove to the Yolo County Courthouse. This is consistent with what STANFIELD told CHS-1 earlier in the day.

55. Surveillance units observed and followed GIPSON throughout the day as well. GIPSON was observed driving a blue Chevy Blazer CA# 9WSL922 which returned as a Hertz rental vehicle. Throughout the day, GIPSON drove to various locations including Sacramento, Napa, Vallejo and Fairfield. At approximately 1534 hours, GIPSON stopped and parked in stall 41 at GIPSON's Residence 2 and entered the apartment building.

56. Later that day, STANFIELD, PRASAD, and the unknown female left the Yolo Courthouse and drove back to PRASAD's Residence where PRASAD was dropped off. STANFIELD spoke with CHS-1 and advised he was going to order the two pounds of methamphetamine from his source when he got back to his house. During the operation, CHS-1 received a text message from the phone number 707-613-7017 (STANFIELD PHONE 2). Based on STANFIELD PHONE 2 replying to CHS-1, CHS-1 believed the phone belonged to STANFIELD. STANFIELD's probation officer later informed TFO Ryken that STANFIELD had listed STANFIELD PHONE 2 as his new phone number with probation.. At 1604 hours, STANFIELD, via STANFIELD PHONE 2, told CHS-1 he would order the two pounds of methamphetamine when he returned home. At 1617 hours, STANFIELD PHONE 2

called 510-472-9206 (GIPSON PHONE 2) and had an 11-minute conversation.[4] At 1646 hours, STANFIELD PHONE 2 called GIPSON PHONE 2 just prior to STANFIELD arriving at STANFIELD's Residence (consistent with what STANFIELD said to CHS-1). At 1647 hours, STANFIELD arrived at STANFIELD's Residence. At 1649 hours, STANFIELD texted CHS-1 from STANFIELD PHONE 2 and told CHS-1 to meet at 1011 Monterey St. for the deal.

57. At 1700 hours, GIPSON and the Chevy CA# 9WSL922 departed the Camino Alto Apts. At 1701 hours, GIPSON and the Chevy CA# 9WSL922 met with a silver Volvo CA# 7DOH025 (registered to Walter JACKSON) at the intersection of N Camino Alto and Woodside Dr.. JACKSON was identified as the driver of the Volvo. TFO Ryken later located a phone number associated with JACKSON (707-920-6620) via a check of a Solano County law enforcement database. SCVCTF served administrative subpoena for phone tolls associated to 707-920-6620 on August 5, 2026. A review of phone tolls revealed that 707-920-6620 (JACKSON) called GIPSON PHONE 2 on July 29, 2026 at 1655 hours and GIPSON PHONE 2 returned a call to JACKSON at 1656 hours. Both calls were made just prior to detectives viewing GIPSON and JACKSON meet in person.

58. At approximately 1704 hours, STANFIELD PHONE 1 made two phone calls and sent one text message to GIPSON PHONE 2**.** Based on these facts and circumstances surrounding the phone activity, I concluded STANFIELD PHONE 2 was another cell phone being used by STANFIELD and GIPSON PHONE 2 was another cell phone being used by GIPSON.

59. At 1705 hours, GIPSON ended the meetup with the Volvo and drove directly to STANFIELD's Residence. At 1711 hours, GIPSON parked the Chevy in front of the driveway at STANFIELD's Residence. GIPSON exited the Chevy and was observed via pole camera carrying a black plastic shopping bag in his left hand which appeared to be weighted down. GIPSON was let into STANFIELD's Residence. At 1716 hours, GIPSON exited STANFIELD's Residence with his hands empty. GIPSON walked to the Chevy. STANFIELD stood at the door of the residence. GIPSON departed the location.

---

[4] An administrative subpoena of GIPSON PHONE 2 revealed "Ronnie LOTT" was the subscriber of the phone. Based on my training and experience, I know that individuals involved in illegal narcotics dealing often register phones in the names of other persons, or use fictitious names to register phones, in order to conceal their illegal activity from law enforcement.

60. TFO Ryken and SA Ceccon met CHS-1 at a pre-arranged meeting location. CHS-1's person and vehicle were searched for contraband and money with negative results. CHS-1 was provided with $2,400 of FBI buy funds for the purchase. CHS-1 was monitored under constant surveillance to and from the buy location.

61. At 1749 hours, CHS-1 arrived on Monterey St. south of Overland Alley. At 1750 hours, STANFIELD exited STANFIELD's Residence carrying a backpack and walked down the alley to CHS-1 and CHS-1's vehicle. STANFIELD entered CHS-1's vehicle and removed a black shopping bag from the backpack. This was consistent with the bag GIPSON carried in and left at STANFIELD's residence. STANFIELD provided the black bag which contained two clear Ziplock bags of suspected methamphetamine to CHS-1. CHS-1 provided the $2400 of FBI buy funds to STANFIELD. CHS-1 drove down the alley and STANFIELD exited and went back into STANFIELD's Residence.

62. SA Ceccon and TFO Ryken met CHS-1 at the prearranged meeting location. Agents recovered the two pounds of suspected methamphetamine in the black bag purchased from STANFIELD. No unauthorized contraband or money was located on CHS-1 or in CHS-1's vehicle.



Figure 5: Still photo from pole camera of GIPSON walking to STANFIELD's residence with black bag.



Figure 6: 2 pounds of suspected methamphetamine and black bag provided by STANFIELD to CHS-1.

A later review of GPS ping activity from STANFIELD PHONE 2 showed that STANFIELD PHONE 2 consistently moved with STANFIELD PHONE 1. Also, I observed GPS ping activity from GIPSON PHONE 2 consistently moved with GIPSON PHONE 1.

**J. <u>Controlled Buy Operation with STANFIELD on August 12, 2026 using CHS-2</u>**

63. On August 10, 2026, CHS-2 advised that STANFIELD communicated with CHS-2 via STANFIELD PHONE 1**.** STANFIELD told CHS-2 he had a firearm for sale. STANFIELD texted CHS-2 a photo of the firearm. CHS-2 was instructed by TFO Ryken to agree to purchase the firearm later in the week. The buy was later set for August 12, 2026.

64. On August 12, 2026, CHS-2 spoke with STANFIELD prior to the controlled buy. STANFIELD told CHS-2 he didn’t want the firearm at his house for that long, so he got rid of it. STANFIELD said his “brother” (PRASAD) was bringing a firearm to STANFIELD’s house for CHS-2.

65. TFO Ryken and SA Ceccon met CHS-2 at a pre-arranged meeting location. CHS-2’s person and vehicle were searched for contraband and money with negative results. CHS-2 was provided with $800 of buy funds for the purchase. CHS-2 was monitored under constant surveillance to and from

the buy location.

66. At approximately 1411 hours, CHS-2 arrived and entered **STANFIELD's Residence**. Once STANFIELD and CHS-2 met in person, STANFIELD made a phone call from STANFIELD PHONE 1 Agents monitored the active PRTT of STANFIELD PHONE 1 and observed that STANFIELD had called PRASAD PHONE 1. During the phone call, CHS-2 overheard PRASAD advising that he was in traffic and on his way to Vallejo. CHS-2 provided $700 of the FBI buy funds to STANFIELD for the firearm. Around this same time, PRASAD's Vehicle was read on Flock ALPR in Fairfield consistent with PRASAD leaving PRASAD's Residence. Agents monitored the GPS ping active on PRASAD's phone and observed it moved consistently with PRASAD's Vehicle as it drove to Vallejo.

67. At 1436 hours, PRASAD's Vehicle turned into Overland Alley and parked in the driveway of STANFIELD's Residence. PRASAD entered STANFIELD's Residence with a large black backpack. Once inside the residence, PRASAD removed the firearm from the backpack and provided it to CHS-2. The firearm was inside a holster. Included in the purchase were two loaded magazines, one of which was a 30-round magazine. CHS-2 left the residence and met with agents under constant surveillance.

68. TFO Ryken recovered the firearm which was a PMF (Privately Made Firearm) lower with a Glock slide upper receiver. The Glock slide had serial #FYK665 affixed to it. The magazines were both loaded with various rounds of 9mm ammunition. Some of the various types of 40 caliber ammunition included Hornady, EPU 40 SW, Ammo Inc. 40 SW and GSL 40 SW. No unauthorized contraband or money was located on CHS-2 or in CHS-2's vehicle. CHS returned the remaining $100 of buy funds to agents.



Figure 7: Photo of Firearm, holster, magazines and ammunition purchased from STANFIELD and PRASAD.

**K. <u>Surveillance of GIPSON</u>**

69. On August 18, 2026, TFO Ryken conducted surveillance of GIPSON's Residence 1. At 0908 hours, GIPSON's Vehicle was observed parked in the driveway. At 0909 hours, GIPSON walked from the porch by front door, down the driveway carrying two packages. GIPSON entered GIPSON's Vehicle and departed.

70. On August 25, 2026, TFO Ryken and assisting detectives conducted on-foot surveillance at GIPSON's Residence 2.

71. At 1042 hours, GIPSON's Vehicle turned onto N. Camino Alto. from Tuolumne St. Vallejo. GIPSON's Vehicle backed into parking stall #41 at the Camino Alto Apts.. GIPSON exited GIPSON's Vehicle, locked it and walked towards the apartment building. At 1047 hours, GIPSON entered the second story hallway of the Camino Alto Apts.. GIPSON inserted a key into the door handle of apartment 208 (GIPSON's Residence 2). GIPSON opened the door of GIPSON's Residence 2, entered the apartment and closed the door.

**L. <u>September 1, 2026 GIPSON drug trafficking activity involving AUSTIN</u>**

72. On September 1, 2026, TFO Ryken was monitoring the GPS ping and PRTT data of GIPSON PHONE 1 and GIPSON PHONE 2. At 0809 hours, GIPSON PHONE 2 received a call from 369-217-5992 (AUSTIN PHONE 1). Shortly thereafter, GIPSON PHONE 2 made two outgoing calls to

AUSTIN PHONE 2. During this time, the GPS data from GIPSON PHONE 2 indicated that he was present at GIPSON RESIDENCE 1.[5]

73. At 0922 hours, GIPSON PHONE 2 called AUSTIN PHONE 2 again. At approximately the same time, GIPSON PHONE 2's GPS data showed that it was at GIPSON RESIDENCE 2. At 0935 hours, GIPSON PHONE 2 made another call to AUSTIN PHONE 2. At approximately the same time, GIPSON PHONE 2's GPS data showed that it was near 1137 Overland Alley, which is where both STANFIELD's RESIDENCE and AUSTIN's RESIDENCE are located. A later review of pole camera footage showed that GIPSON arrived at 1137 Overland Alley at approximately 0935 hours in GIPSON VEHICLE 1.

74. GIPSON exited the vehicle briefly but then returned to the driver's seat. A short time later, AUSTIN exited the top-floor apartment of 1137 Overland Alley (AUSTIN's RESIDENCE) and walked down to GIPSON's vehicle. AUSTIN reached into the driver's seat of the vehicle, where GIPSON was sitting, and was handed a weighted black plastic bag. AUSTIN cradled the bag against his body and returned to AUSTIN's RESIDENCE. A still image of AUSTIN retrieving the bag is below:



[5] The GPS data from GIPSON PHONE-1 shows it moving consistently with GIPSON PHONE 2. For simplicity, this paragraph only mentions the pings of GIPSON PHONE 2.

75. TFO Jason Thompson later reviewed surveillance video of 1137 Overland Alley and identified the black male adult as Montrell AUSTIN. TFO Thompson was familiar with AUSTIN through prior contacts and investigations. TFO Thompson identified AUSTIN to be a Cutthroat Mob gang member from the Country Club Crest area of Vallejo.

76. Based on my training and experience, as well as on the evidence gathered during this investigation, I believe that AUSTIN used AUSTIN PHONE 1 to communicate with GIPSON to arrange the distribution of controlled substances. The manner in which GIPSON arrived and handed off a weighted black plastic bag is consistent with how GIPSON has been observed to conduct short-stay drug transactions, as is the series of calls which occurred in the period before the transaction.I further reviewed the pole camera surveillance from September 1, 2026, and observed that, earlier that day, AUSTIN arrived at 1137 Overland Alley in a black Mazda SUV (AUSTIN's VEHICLE). AUSTIN used a key to open the front door to AUSTIN's RESIDENCE and then entered the residence.

77. TFO Drake Wiest later located AUSTIN's VEHICLE via a review of Flock ALPR. The Mazda bearing Washington plate #CTA4660 was read on Tennessee St. eastbound at Monterey St at 0900 hours, just prior AUSTIN's arrival at 1137 Overland Alley:



78. A record check of AUSTIN's VEHICLE showed that it was a rental vehicle registered to PV holding Corp. A record check of AUSTIN returned he was a convicted felon pursuant to 29800 PC-Prohibited Person in Possession of a Firearm.

79. Throughout the investigation, short-term stay traffic has been observed coming and going from AUSTIN's Residence and STANFIELD's Residence. During controlled buy operations from STANFIELD, SCVCTF personnel have observed numerous individuals coming and going from AUSTIN's Residence. Furthermore, pole camera surveillance frequently revealed the same short-term activity occurring at AUSTIN's Residence and STANFIELD's Residence. This pattern and volume of short-stay traffic is consistent with both AUSTIN and STANFIELD using their respective residences for the distribution of controlled substances.

80. Based on the investigation up to this point, I believe STANFIELD, PRASAD and GIPSON are conspiring and profiting from the sale of methamphetamine and other controlled substances. Furthermore, I believe that STANFIELD is sourcing his methamphetamine from GIPSON. STANFIELD has supplied various controlled substances to multiple FBI sources during controlled buy/walk operations. During each operation, STANFIELD had at least one other individual aiding or assisting him with his drug business.

### M. <u>GIPSON Travels to 2566 Kit Carson St to Obtain Controlled Substances on September 8, 2026</u>

81. On September 8, 2026, SCVCTF conducted surveillance of GIPSON. During the morning hours, TFO Ryken observed a white Nissan Altima rental vehicle bearing CA# 9ZSE322 parked in the driveway of 5058 Brookdale Cir where GIPSON's phones were pinging. Throughout the day, this Nissan moved throughout Vallejo and Fairfield consistently with GIPSON's phones.

82. During the course of this investigation, agents have observed a pattern of GIPSON travelling to the Sacramento area, visiting one or two locations for a short period of time, and then returning home to the Vallejo/Fairfield area. On June 18, 2026, SCVCTF observed GIPSON travelling eastbound on I-80 towards Sacramento. SCVCTF conducted rolling surveillance of GIPSON and observed his vehicle park around 2566 Kit Carson. GIPSON stayed in the area for approximately 10 minutes before departing the area and returning to Solano County. SCVCTF has observed numerous of

these trips throughout the investigation. SCVCTF has reviewed vehicle tracker data and cell phone location data which are consistent with GIPSON repeatedly driving to the location from Solano County.

83. GIPSON appears to make approximately one to two trips to the Sacramento area every week, though that has been observed to vary over time. From my training and experience, I know that individuals involved in illegal narcotics trafficking usually have an established source of supply that they obtain drugs from. Based on the frequency and duration of GIPSON's travel to Sacramento, agents came to believe that GIPSON was using these trips to visit his source of supply and purchase or otherwise obtain methamphetamine and/or cocaine.

84. On September 8, 2026, at approximately 1757 hours, SA Ceccon observed GIPSON's phones plot eastbound on I-80 towards Sacramento. Agents believed that GIPSON may have been making this trip in order to re-supply on methamphetamine and/or cocaine. During previous trips, GPS ping data and agent surveillance had observed GIPSON appearing to conduct a re-supply in the area of Kit Carson St and Revere St in Sacramento. Accordingly, agents established surveillance in that area.

85. At 1848 hours, surveillance units observed GIPSON's rental Nissan arrive in the area of Kit Carson St. and Revere St., in Sacramento. Shortly after arriving, GIPSON entered 2566 Kit Carson St. with a black bag slung over his shoulder. 2566 Kit Carson is a single residential unit within a two-story housing complex. The front door of the unit faces outward, and the numbers "2566" are visible on a sign directly above the front door.

86. At 1858 hours, GIPSON exited the residence with the black bag over his shoulder. GIPSON stopped and spoke with a black male in front of the residence. At 1934 hours, GIPSON returned to his rental vehicle. GIPSON departed the area and surveillance units followed him.

87. At 1955 hours, a marked Solano County Sheriff's Office vehicle got behind GIPSON on westbound I-80. A Solano County Deputy observed the white Nissan Altima sedan, bearing CA license plate 9ZSE322 traveling westbound on I-80. The Deputy visually determined that the vehicle was traveling at a speed in excess of the posted speed limit of 65 MPH. The Deputy paced the vehicle, and while pacing, the patrol vehicle's speedometer read 80 MPH. Based on this, the Deputy determined that GIPSON's vehicle was in violation of California Vehicle Code § 22350(a).

88. The Deputy activated his emergency lights and conducted a traffic enforcement stop.

During this stop, GIPSON was contacted as the driver and sole occupant of his vehicle. The Deputy advised Gipson of the reason for the stop. Gipson then provided his CA driver's license. Gipson said that he thought someone was tailgating him which is why he was speeding. The Deputy decided to issue a citation for a violation of VC § 22350(a). The Deputy had Gipson step out of the vehicle while the Deputy was issuing the citation.

89. While authoring the citation, a K9 Deputy and his K9 partner "Ty" arrived on scene. The K9 Deputy, with his partner K9 Ty, conducted an open-air odor check of GIPSON's vehicle. K9 Ty alerted to the odor of narcotics coming from GIPSON's vehicle, and the Deputies determined that there was probable cause to search the vehicle.

90. Deputies then searched the Nissan. During the search, Deputies located a small black Adidas backpack on the passenger side rear floorboard. The Deputy opened the large zip compartment on the backpack and observed a black plastic bag. The Deputy retrieved the black plastic bag from inside of the backpack and opened the plastic bag. This revealed a zip-loc bag containing large white crystalline substance. Based on training and experience, the Deputy believed this to be suspected Methamphetamine.

91. Deputies detained GIPSON and conducted a search of his person. A clear plastic bag was in GIPSON's waistband containing six (6) total bundles of suspected Cocaine. Three of the bags were consistent with cocaine base and the three others were consistent with Cocaine HCL. $980 of cash in various denominations was in GIPSON's left front pants pocket.

92. During the search of GIPSON and the Nissan, Deputies recovered three cellular phones. An orange Apple iPhone was in GIPSON's left cargo pocket. This phone was believed to be GIPSON PHONE 1. A black TCL flip phone (GIPSON PHONE 2) was in the center console cup holder. A silver Apple iPhone in a blue case was located on the center console.

93. GIPSON was arrested and booked into the Solano County Jail. The following is a photo of the drugs and currency located during the search of GIPSON's person and GIPSON's vehicle:



94. GIPSON was released from Solano County Jail on or about September 10, 2026. Along with other items of personal property, the three phones seized from GIPSON during his arrest were returned to GIPSON when he was released.

95. Based on the above observations and my training and experience, I believe that 2566 Kit Carson is being used as a location for the storage and distribution of illegal drugs. I further believe that GIPSON visited 2566 Kit Carson on September 8, 2026, to obtain illegal drugs.

**N. <u>September 11, 2026 activity at 1137 Overland Alley</u>**

96. On September 14, 2026, TFO Ryken reviewed pole camera surveillance and vehicle tracker data. The following is a timeline of the events from September 11, 2026. At approximately 1540 hours, GIPSON's VEHICLE entered Overland Alley from Monterey St. GIPSON stayed parked in the Dodge in front of the driveway. AUSTIN then exited the residence shirtless and walked down the stairs to GIPSON's Dodge. GIPSON appeared to be moving around the passenger compartment and opening a bag or a container. GIPSON appeared to put an object on the passenger seat of the Dodge.

97. When he arrived at GIPSON's vehicle, AUSTIN reached inside the Dodge and retrieved

an object from the passenger seat. AUSTIN then placed the item in his pants or pants pocket and returned to AUSTIN's apartment. GIPSON made a three point turn in the Dodge and left westbound through the alley towards Monterey St.

98. Based on my training and experience and the other transactions observed during this investigation, I believe that AUSTIN and GIPSON met on this occasion so that GIPSON could supply AUSTIN with controlled substances. I further believe that the object which GIPSON placed on his passenger seat, and which AUSTIN retrieved from the passenger seat, contained controlled substances.

## II. CONCLUSION

99. Based on the foregoing, I submit there is probable cause to believe that Bobby Lee STANFIELD, Marcus GIPSON, and Roneel PRASAD did knowingly and intentionally conspire to distribute controlled substances, in violation of 21 U.S.C. § 846 & 841(a)(1), beginning on a date unknown but no later than on or about April 1, 2026, and continuing to present; that Bobby Lee STANFIELD and Roneel PRASAD distributed fentanyl, in violation of 21 U.S.C. § 841(a)(1), on or about April 27, 2026; and that Marcus GIPSON possessed with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), on or about September 8, 2026. I respectfully request that a criminal complaint be issued against the defendants for the crime detailed above, and based upon this criminal complaint, that arrest warrants be issued for each of these defendants.

//

//

//

//

//

//

//

//

//

//

//

100. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, complaint, and arrest warrants, except that copies of the arrest warrants in full or redacted form may be maintained by the United States Attorney's Office and may be served by Special Agents and other investigative and law enforcement officers, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrants. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and arrest warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/

Dalton Ryken
Task Force Officer
FBI

Subscribed and sworn to me via telephone on: September 22, 2026

Chi Soo Kim

The Honorable Chi Soo Kim
UNITED STATES MAGISTRATE JUDGE

/s/ Charles Campbell

Approved as to form by AUSA CHARLES CAMPBELL